O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HERMAN F. EVANS,

          Plaintiff,

          v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

          Defendant.

Case No. CV 15-07974-KES

MEMORANDUM OPINION AND
ORDER

     Plaintiff Herman Evans ("Plaintiff") appeals the final decision of the Administrative Law Judge ("ALJ") denying his application for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons discussed below, the ALJ's decision is AFFIRMED.

## I.
## BACKGROUND

     Plaintiff applied for DIB on August 23, 2012 and SSI on September 7, 2012, alleging the onset of disability three years earlier on March 9, 2009. Administrative Record ("AR") 12.   In 2009, Plaintiff was working as a

correctional officer.  AR 280.  He had been off work since 2007 due to another injury (i.e., he was hit in the head by a "combative minor," causing him to fall to the ground and suffer neck and back pain).  AR 545.  He returned to work on February 19, 2009.  Id.  After less than a month back on the job, Plaintiff injured his neck, back and right hip, knee and ankle as a result of an incident in which he "was restraining a minor and fell to the ground."  AR 497.  He was taken to the emergency room and discharged after receiving pain medication and x-rays that revealed no fractures.  Id.

On August 7, 2013, an ALJ conducted a hearing, at which Plaintiff, who was represented by counsel, appeared and testified.  AR 33-53.  On September 18, 2013, the ALJ issued a written decision denying Plaintiff's request for benefits.  AR 120-137.  After the Appeals Council remanded the case, a second hearing was conducted on June 8, 2015.  AR 54-90.  The ALJ issued a second decision denying Plaintiff's request for benefits dated July 8, 2015.  AR 9-32.

The ALJ found that Plaintiff had the severe impairments of "cervical and lumbar spine degenerative disc disease; obesity; history of bilateral carpal tunnel syndrome, and bilateral shoulder degenerative joint disease."  AR 15.  The ALJ also found that Plaintiff "does not suffer from any medically determinable severe mental impairment."  AR 20.

Notwithstanding his physical impairments, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work, limited to "standing and/or walking up to 4 hours total per 8-hour workday (up to 1 hour at a time); sitting up to 6 hours total per 8-hour work day; performing occasional postural movements; performing no crawling activities; frequent [but not constant] use of bilateral upper extremities; no climbing ropes/ladders/scaffolds; no working around heights, concentrated vibrations or dangerous machinery; and occasionally using his lower extremities to operate foot pedals."  AR 21.  Based on this RFC and the

testimony of a vocational expert ("VE"), the ALJ found that Plaintiff would be able to work as an office helper, mail clerk, or cashier.  AR 27.  Therefore, the ALJ concluded that Plaintiff is not disabled.  <u>Id.</u>

## II.

## ISSUES PRESENTED

<u>Issue No. 1</u>: Whether the ALJ erred by concluding that Plaintiff's conditions do not meet or equal Listing 1.04(A).

<u>Issue No. 2</u>: Whether the ALJ erred by giving controlling weight to non-examining physician Dr. Lorber rather than (1) treating physician Dr. Schwarz, (2) examining physician Dr. Bilezikjian, and/or (3) examining physician Dr. Hasday.

<u>Issue No. 3</u>: Whether the ALJ erred by finding that Plaintiff's medically determinable depression was not "severe."

<u>Issue No. 4</u>: Whether the ALJ erred in assessing Plaintiff's credibility and discounting his testimony concerning the extremely limiting effects of his pain.  <u>See</u> Dkt. 17, Joint Stipulation ("JS") 3.

## III.

## DISCUSSION

**A.    ISSUE ONE:  The ALJ did not err by finding that Plaintiff's conditions do not meet or equal Listing 1.04(A).**

**1.    Step Three of the Sequential Evaluation Process.**

ALJs apply a five-step evaluation process to determine whether a claimant qualifies as disabled.  20 C.F.R. § 404.1520(a)(4).  At step three of the sequential evaluation process, an ALJ considers whether an applicant has an impairment or combination of impairments that meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1525.  Listed impairments are those that are "so severe that they are irrebuttably presumed disabling,

without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs." Lester v. Chater, 81 F.3d 821, 828 (9th Cir. 1995). If the claimant's impairment meets or equals one of the listed impairments, then he qualifies for benefits without further inquiry. 20 C.F.R. § 416.920(d); Sullivan v. Zebley, 493 U.S. 521, 525 (1990).

The claimant bears the burden of proving that he has an impairment that meets or equals a listed impairment. Zebley, 493 U.S. at 530 (noting burden of proof rests with claimant to provide and identify medical signs and laboratory findings that support all criteria for step-three impairment determination). "To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim." Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment." Id. (quoting 20 C.F.R. § 404.1526); see also 20 C.F.R. § 416.926. A "generalized assertion of functional problems is not enough to establish" medical equivalence. Id. at 1100.

An ALJ "must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001). The ALJ need not, however, "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not satisfy Listing). An ALJ's decision that a plaintiff did not meet a listing must be upheld if it was supported by "substantial evidence." Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

1    reasonable mind might accept as adequate to support a conclusion."

2    Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (internal quotation

3    marks omitted).  When evidence is susceptible of more than one rational

4    interpretation, the Court must uphold the ALJ's conclusion.  Id.  This Court,

5    however, may not engage in post hoc justification on grounds not relied upon

6    by the ALJ.  S.E.C. v. Chenery, 332 U.S. 194, 196 (1947).

7        **2.    Listing 1.04(A).**

8        Plaintiff contends that his impairments meet or equal Listing 1.04(A).  JS

9    3-5.  In order to meet Listing 1.04, a claimant must establish a spine disorder

10   (such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis,

11   osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture")

12   resulting in compromise of a nerve root or the spinal cord, plus satisfy either

13   subpart A, B or C.  Listing 1.04(A) requires (1) evidence of nerve root

14   compression characterized by neuro-anatomic distribution of pain;

15   (2) limitations of motion of the spine; (3) motor loss ("atrophy with associated

16   muscle weakness or muscle weakness") accompanied by sensory or reflex loss,

17   and (4) because Plaintiff's lower back is involved, positive seated and supine

18   straight-leg raising tests.[1]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

19   These symptoms must all be present at the same time.  Smith v. Colvin, 2016

20   U.S. Dist. LEXIS 14766, at *7-9 (D. Or. Feb. 5, 2016), citing SSA policy

21   announced in AR 15-1(4), 2015 SSR LEXIS 2.  Additionally, the

22   impairment(s) must satisfy the 12-month durational requirement.  20 C.F.R.

23   §§ 404.1525(c)(4), 416.925(c)(4).

24
25        [1] To perform a supine straight-leg raising test, the patient lies down on
26   his/her back and the examiner lifts the patient's leg while the knee is straight.
     If the patient experiences pain when the straight leg is at an angle of between
     30 and 70 degrees, then the test is positive and a herniated disc is likely to be
27   the cause of the pain.  See https://en.wikipedia.org/wiki/Straight_leg_raise.
28

Listing 1.04 falls under Section 1.00 addressing impairments affecting the musculoskeletal system.  All of the listings for the musculoskeletal system are preceded by the Section 1.00 "introduction" which "contains information relevant to the use of the listings in that body system; for example, examples of common impairments in the body system and definitions used in the listings for that body system."  20 C.F.R. § 404.1525(c)(2).  The introduction "may also include specific criteria for establishing a diagnosis, confirming the existence of an impairment, or establishing that [the claimant's] impairment(s) satisfies the criteria of a particular listing in the body system."  Id.

The Commissioner contends Listing 1.04(A) is subject to the additional severity requirements found in the introduction section for the musculoskeletal system.  The regulations explain, "[w]e will find that your impairment (s) meets the requirements of a listing when it satisfies all of the criteria of that listing, *including any relevant criteria in the introduction*, and meets the duration requirement[.]" 20 C.F.R. § 416.925(c)(3) (emphasis added).  The potentially relevant portion of the introduction to the Section 1.00 listings states, "[r]egardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to effectively ambulate on a sustained basis … or the inability to perform fine and gross movements effectively on a sustained basis for any reason."  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(a).  The introduction goes on to define the "inability to perform fine and gross movements effectively" and the "inability to effectively ambulate."  Id., § 1.00(B)(2)(b) and (c).  The "inability to effectively ambulate" is defined as unable to ambulate "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," e.g., two canes, two crutches or a walker.  Id., § 1.00(B)(2)(b).

The Commissioner argues that Listing 1.04(A) requires functional loss in terms of either ambulation impairment or fine/gross movement impairments.

JS 6.  Some courts have agreed with the Commissioner, relying on 20 C.F.R. § 416.925(c)(3).  Others have found that the ambulatory or fine and gross movement provisions in the introduction do not create additional requirements applicable to all of the musculoskeletal system listings.  See Smith , 2016 U.S. Dist. LEXIS 14766, at *10-12 (citing cases with both holdings).

In Smith, the court opined that as a matter of construction, the text of the regulations would include redundant language if the introduction established additional requirements regarding ambulation or fine/gross movements.  Listing § 1.02(B), for example, explicitly requires a claimant to establish a condition which results in "inability to perform fine and gross movements effectively, as defined in 1.00B2c."  Similarly, Listings §§ 1.02(A), 1.03, and 1.04(C) all require a claimant establish a condition which results in "inability to ambulate effectively, as defined in 1.00B2b."  From this, Smith concludes that if the Commissioner's interpretation of the regulatory scheme were correct, then provisions of the aforementioned listings would be redundant, defying a core tenet of statutory interpretation.  Smith, 2016 U.S. Dist. LEXIS 14766, at *10-12, citing Republic of Ecuador v. Mackay, 742 F.3d 860, 864 (9th Cir. 2014) ("it is a cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").

This Court is not convinced that adopting the Commissioner's position would create redundancy.  Rather, applying the requirements in the introduction to each musculoskeletal system listing would mean that (1) if the individual listing does not specify the form of functional loss that satisfies it, then either the inability to ambulate or perform fine/gross movements effectively will suffice, but (2) if the individual listing specifies one or the other, then only the specified form of functional loss will suffice.  This interpretation is consistent with 20 C.F.R. § 416.925(c)(3) and does not render any portion of the listings redundant.  This interpretation also means that to meet any subpart

of Listing 1.04(A), the claimant must demonstrate significant functional loss, which is consistent with the purpose of the listings.

Thus, to meet Listing 1.04(A), Plaintiff must satisfy the requirements of that specific listing and show functional loss in terms of either ambulation impairment or fine/gross movement impairments, as provided in the introduction to all the musculoskeletal system listings.

### 3.   Summary of the ALJ's Findings.

The ALJ found that Plaintiff suffers from degenerative disc disease, a condition mentioned in Listing 1.04.  AR 15.  The ALJ further found that Plaintiff's degenerative disc disease affect his "cervical and lumbar" spine, meaning both his upper and lower back.  Id.  The ALJ, however, concluded that Plaintiff's spinal impairments did not meet or equal Listing 1.04 because his impairments "have not resulted in the requisite deficits of gait or neurological function."  AR 20.  By referring to the "requisite deficits of gait or neurological function," the ALJ was apparently referring to the inability to ambulate or perform fine/gross movements effectively, as required by 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(a)-(c).

### 4.   Analysis.

Plaintiff does not contend that his abilities to ambulate or perform fine/gross movements are impaired to the extent required by the definitions in 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(a)-(c), let alone point to any medical evidence supporting such a contention.  Rather, he argues that these requirements are not part of Listing 1.04(A).  JS 4-5.  As discussed above, satisfying Listing 1.04(A) *does* require showing functional loss in the form of either inability to ambulate or perform fine/gross movements effectively.  20 C.F.R. § 416.925(c)(3); 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(a).  Plaintiff, therefore, has not carried his burden of

demonstrating that the ALJ erred at Step Three.[2]

**B.    ISSUE TWO:  The ALJ did not err by giving controlling weight to the opinions of non-examining physician Dr. Lorber rather than those of Drs. Schwarz, Bilezikjian, or Hasday.**

**1.    Applicable Law.**

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither, but reviewed the plaintiff's medical records.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  Id.

When a treating or examining physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide "specific and legitimate reasons" for discounting it that are supported by substantial evidence.  Id. (citation omitted).

The weight given a physician's opinion depends on whether it is consistent with the record and accompanied by adequate explanation, the nature and extent of the treatment relationship, and the doctor's specialty, among other things.  20 C.F.R. § 416.927(c)(3)-(6).  Medical opinions that are inadequately explained or lack supporting clinical or laboratory findings are entitled to less weight.  See Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (holding that ALJ properly rejected physician's determination where it

---

[2] Even at the hearing, Plaintiff's counsel told the ALJ, "Mr. Evans doesn't meet the listing of 1.04 or 12.04 …."  AR 39.

was "conclusory and unsubstantiated by relevant medical documentation"); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected "check-off reports that did not contain any explanation of the bases of their conclusions").

The ALJ is responsible for resolving conflicts in the medical evidence. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). In doing so, the ALJ is always permitted to employ "ordinary techniques" for evaluating credibility, including inconsistencies in a witness's testimony. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). Thus, internal inconsistencies are a valid reason to accord less weight to a medical opinion. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (upholding inconsistency between a treating physician's opinions and his own treatment notes as a reason to discount his opinions); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (upholding ALJ's rejection of a medical opinion that was internally inconsistent); Gabor v. Barnhart, 221 F. App'x 548, 550 (9th Cir. 2007) ("The ALJ noted internal inconsistencies in Dr. Moran's report, which provide a further basis for excluding that medical opinion."); Gonzales v. Colvin, 2015 U.S. Dist. LEXIS 148471, at *12 (C.D. Cal. Oct. 30, 2015) (upholding ALJ's rejection of medical opinion assessing inconsistent social functioning and GAF scores); Khan v. Colvin, 2014 U.S. Dist. LEXIS 86558, at *22 (C.D. Cal. June 24, 2014) ("The ALJ's first reason for rejecting Dr. Multani's opinion – to wit, that his opinion was internally inconsistent – is specific and legitimate.").

## 2.   Summary of the Medical Evidence.

As to each of the four doctors relevant to Issue Two, the Court provides a chronological summary of their opinions and treatment notes addressing Plaintiff's functional limitations.

1        a.    Dr. Schwarz

2    Dr. Schwarz is an orthopedic surgeon who established a treating

3    relationship with Plaintiff in 2007, then again in 2009.[3]  His relevant opinions

4    in the record include the following:

5    • 3/31/09:  Immediately following Plaintiff's March 2009 fall, he noted

6    tenderness and some limitations in the range of motion for Plaintiff's spine.

7    AR 495-96.  Plaintiff reported right knee and ankle pain brought on by

8    "prolonged walking or standing as well as climbing."  AR 494.  Dr. Schwarz

9    found no motor, reflex or sensory deficits in Plaintiff's upper or lower

10   extremities.  AR 496-97.  As for Plaintiff's right shoulder, Dr. Schwarz noted

11   "no tenderness is palpable" and Plaintiff had "5+/5 for shoulder abduction."

12   AR 496.  The straight leg-raising test "in the seated and supine position

13   produced pain in the lumbar spine …."  AR 497.  Nevertheless, Plaintiff's

14   "strength was intact for heal and toe walking."  Id.

15   Based on this examination, Dr. Schwarz opined that Plaintiff was

16   "temporarily totally disabled" for purposes of workers' compensation, but he

17   expected Plaintiff to improve in 3-4 months.  AR 498.  The treatment plan was

18   to continue pain medication (hydrocodone) and refer Plaintiff for physical

19   therapy.  AR 498.

20   • 4/9/09:  He noted "no significant change."  AR 408.

21   • 4/14/09:  He opined that "physical therapy is indicated" to work

22

23       [3] Dr. Schwarz treated Plaintiff in 2007 for an earlier industrial injury that
24   occurred when a juvenile detainee hit Plaintiff, causing him to fall down.  AR
     544.  At that time, Plaintiff was given pain medication, six weeks of physical
25   therapy and a cane.  Id.  Due to complaints of neck and back pain, Plaintiff
26   underwent a series of medical imaging tests, but with normal results.  Id.  He
     was only back at work from this injury for approximately one month before his
27   March 2009 injury leading to the instant claim for benefits.  Id.

28

11

toward "functional restoration," but Plaintiff had not received any yet.  AR 501-502.

• 4/23/09:  He noted Plaintiff's condition as "worsered" based on reported knee and ankle pain.  AR 409.

• 5/14/09:  He noted Plaintiff's condition as "worsered," citing tenderness in the right leg, knee and elbow.  AR 410.

• 6/4/09:  He noted "no significant change."  AR 412.

• 6/25/09:  He noted "no significant change."  AR 411.

• 7/16/09:  He noted "no significant change."  AR 413.

• 8/4/09:  He noted "no significant change."  AR 414.

• 8/18/09:  He noted "no significant change."  AR 415.

• 8/19/09:  He reviewed an MRI of Plaintiff's lumbar spine from July 2009 which showed only "mild" to "moderate" abnormalities (i.e., central canal narrowing, foraminal narrowing, and bilateral facet hypertrophy[4]), and no soft tissue or bone injury.  AR 467, 470.  The recommended treatment was still "home exercises" and pain medication.  AR 468.

• 9/10/09:  He noted "no significant change."  AR 416.

• 10/1/09:  He noted "no significant change."  AR 417.

• 10/6/09:  He examined Plaintiff, who complained of pain affecting his back, right elbow and right knee.  AR 481.  He noted again that he would

---

[4] Foraminal narrowing refers to narrowing of the foraminal canal, a passageway to the left and right of vertebrae that allows nerves to exit the central spinal cord.  "Facet hypertrophy is the term used to describe a degeneration and enlargement of the facet joints … which are a pair of small joints at each level along the back of the spine, are designed to provide support, stability, and flexibility to the spine.  The facet joint may become enlarged as part of the body's response to degeneration of the spine, i.e., to try to provide additional stability to counteract the instability from degenerative disc disease."  See www.spine-health.com.

arrange a physical therapy program.  Id.

• 10/27/09:  He noted "no significant change."  AR 418.

• 11/17/09:  He noted "no significant change."  AR 419.  The treatment plan was still pain medication and "home exercise."  Id.

• 12/8/09:  He noted "no significant change."  AR 420.

• 12/29/09:  He noted "no significant change."  AR 421.

• 2/2/10:  He noted "no significant change."  AR 422.

• 2/23/10:  He noted "no significant change."  AR 423.

• 2/24/10:  He reviewed earlier electro-diagnostic testing results which revealed (1) "moderate bilateral carpal tunnel syndrome … affecting sensory and motor components."  AR 461.  With regard to Plaintiff's back, the test showed "no evidence of lumbar or cervical radiculopathy."[5]  Id.  Plaintiff continued to receive the pain medications Vicodin and Motrin.  AR 462.

• 3/16/10:  Dr. Schwarz noted "no significant change."  AR 424.

• 4/6/10:  He noted "no significant change" and "[patient] declined labs."  AR 425.

• 4/27/10:  He noted Plaintiff's condition as "worsered," as Plaintiff reported "severe pain" when he would take a deep breath.  AR 426.

• 5/18/10:  Dr. Schwarz  noted "no significant change."  AR 427.

• 6/10/10:  He noted "no significant change."  AR 428.

• 7/1/10:  He noted "no significant change."  AR 429.

• 7/2/10:  Dr. Schwarz reviewed earlier reports indicating that Plaintiff had been approved to receive physical therapy in the form of "pool treatments

---

[5] "Radiculopathy refers to a set of conditions in which one or more nerves are affected and do not work properly (a neuropathy).  The location of the injury is at the level of the nerve root (radix = root)."  See https:// en.wikipedia .org/wiki/Radiculopathy.

2-3 times per week for 4-6 weeks ….”  AR 454.

• 7/22/10:  He noted “no significant change.”  AR 430.  He also noted that Plaintiff was authorized for pool therapy and was to “start tomorrow.”  Id.

• 8/9/10:  He noted “no significant change,” and Plaintiff was to continue with pool therapy with 1 week off.  AR 431.  Plaintiff received authorization to go 3x per week for 6 weeks.  Id.

• 8/30/10:  He noted “no significant change” and continuing pool therapy.  AR 432.

• 9/20/10:  He examined Plaintiff and noted his condition as “worsened” based on reports of continuing neck pain and spasms.  AR 361.  Plaintiff was advised to continue pool therapy.  Id

• 10/11/10:  He noted no change from prior exam.  AR 362.

• 11/8/10:  Dr. Schwarz noted that Plaintiff had completed pool therapy.  AR 363.

• 11/10/10:  Dr. Schwarz completed a “prolonged service report.”  AR 438.  He indicated that he would refer Plaintiff for a consultation with an “orthopedic spinal surgical specialist.”  AR 439.  He declined to opine on any work restrictions until after learning the results of that consultation.  Id.

• 11/29/10:  He noted “no significant change.”  AR 364.

• 12/1/10:  Dr. Schwarz completed another “prolonged service report.”  AR 435.  He again indicated that Plaintiff would be “referred for the spinal surgical consultation as authorized” and “remains unable to return to work.”  AR 436.

• 12/27/10:  He noted “no significant change.”  AR 365.

• 1/24/11:  He noted “no significant change.”  AR 366.

• 2/28/11:  He noted “no significant change.”  AR 367.

• 3/28/11:  He noted “no significant change.”  AR 368.

• 4/1/11:  Dr. Schwarz wrote another “prolonged service report.”  AR

405.  He indicated that Plaintiff would not be able to perform his past work as a detention service officer but would be capable of performing modified work duties.  AR 406.  His standing and walking needed to be limited to 30 minutes at a time and lifting no more than 20 pounds.  AR 406.  He would also be limited to activities that "do not require significant concentration" due to the side effects of his pain medication.  Id.

• 4/25/11:  He noted Plaintiff's condition as "worsered" based on Plaintiff's report of his low back constantly throbbing.  AR 369.

• 5/23/11:  He noted "no significant change."  AR 370.

• 6/27/11:  He noted "no significant change."  AR 371.

• 7/29/11:  He noted "no significant change" and "home exercise."  AR 372.

• 8/29/11:  He noted Plaintiff's condition as "worsered."  AR 373.

• 9/26/11:  He noted Plaintiff's condition as "worsered."  AR 374.

• 10/24/11:  He noted "no significant change."  AR 375.

• 12/9/11:  He noted "no significant change" and "home exercise.  AR 376.

• 1/13/12:  He noted "no significant change."  AR 377.

• 2/10/12:  He noted Plaintiff's condition as "worsered."  AR 378.

• 3/12/12:  He noted Plaintiff's condition as "worsered."  AR 379.

• 4/23/12:  He noted Plaintiff's condition as "worsered."  AR 380.

• 6/4/12:  He noted Plaintiff's condition as "worsered."  AR 381.

• 7/2/12:  He noted Plaintiff's condition as "worsered."  AR 382.

• 8/6/12:  He noted Plaintiff's condition as "worsered."  AR 383.

• 9/10/12:  He did not check any boxes to describe patient status.  AR 384.

• 10/12/12:  He noted Plaintiff's condition as "worsered."  AR 385.

• 11/9/12:  He noted Plaintiff's condition as "worsered."  AR 386.

• 12/7/12:  He noted Plaintiff's condition as "worsered."  AR 387, 664.

• 1/4/13:  He examined Plaintiff and noted "no significant change."  AR 663.

• 3/1/13:  He examined Plaintiff and noted "no significant change."  AR 661.

• 2/1/13:  He noted Plaintiff's condition as "worsered."  AR 662.

• 4/15/13:  He noted Plaintiff's condition as "worsered." AR 660.

• 7/26/13:  He examined Plaintiff who reported "no significant change." AR 700.  The treatment plan was to continue taking pain medication and "to continue using a cane."  AR 703-04.

• 9/20/13:  Dr. Schwarz wrote a "periodic report" concerning Plaintiff's condition.  AR 693-99.  He noted that Plaintiff now "utilizes a cane for ambulation."  AR 693.  The treatment plan was to continue taking pain medication and "to continue the use of a cane to provide support during ambulation …."  AR 692.

• 10/18/13:  Dr. Schwarz wrote another "periodic report."  AR 688-92. He noted that Plaintiff's condition has "worsened."  AR 688.  The treatment plan was unchanged.  AR 692.

• 11/15/13:  He wrote a letter opining that Dr. Bilezikjian's January 2013 report (AR 518) showed Plaintiff qualified for disability benefits.  AR 675-76.  Despite the 2010 electro-diagnostic testing results which showed "no evidence of lumbar or cervical radiculopathy" (AR 461), he opined that Dr. Bilezikjian's report provided "evidence for nerve root compression" (i.e., radiculopathy) based on "radicular symptoms to the lower extremities as well as loss of range of motion for the lumbar spine."[6]  AR 675.

---

[6] Dr. Lorber commented on this letter saying, "[Dr. Schwarz] concluded that there was evidence of radiculopathy based upon the radicular

16

• 11/22/13:  Dr. Schwarz re-evaluated Plaintiff.  He again noted that a straight-leg raising test produced pain in the lumbar spine.  AR 686.  The treatment plan included continuing pain medication, performing "home exercise as tolerated," and continuing to "use a cane for ambulation as needed."  Id.

• 12/20/13:  Dr. Schwarz re-evaluated Plaintiff again.  His observations and recommendations were essentially the same as for the November 2013 exam.  AR 681-82.

• 1/24/14:  Dr. Schwarz re-evaluated Plaintiff again.  His observations and recommendations were essentially the same as for the November 2013 exam.  AR 678-79.

• 2/28/14:  Dr. Schwarz re-evaluated Plaintiff.  He noted, "The patient indicates that he has reduction of the pain with use of the medications."  AR 897-98.  His treatment plan (i.e., pain medication and home exercises) was the same.  AR 897-99.

• 3/28/14:  His treatment plan was the same.  AR 893-95.

• 5/2/14:  His treatment plan was the same.  AR 889-91.

• 6/6/14:  His treatment plan was the same.  AR 885-87.

• 7/11/14:  His treatment plan was the same.  AR 879-81.

• 8/8/14:  His treatment plan was the same.  AR 875-77.

• 10/6/14:  His treatment plan was the same.  AR 871-73.

• 11/7/14:  His treatment plan was the same.  AR 867-69.

• 12/5/14:  His treatment plan was the same.  AR 863-65.

• 1/16/15:  His treatment plan was the same.  AR 859-61.

symptomology.  That's an inadequate basis for making such a diagnosis."  AR 72.  The "radicular symptoms" apparently referenced by Drs. Bilezikjian and Schwarz are the aches and pains reported by Plaintiff.

• 2/13/15:  His treatment plan was the same.  AR 855-57.

• 3/16/15:  His treatment plan was the same.  AR 851-53.

• 4/17/15:  His treatment plan (i.e., pain medication and home exercises) was the same.  AR 848.

• 5/15/15:  Dr. Schwarz completed a physical residual functional capacity questionnaire.  AR 842-46.  He opined Plaintiff was incapable of even "low stress" work due to "chronic pain."  AR 843.  He opined that Plaintiff could sit, stand or walk for less than 2 hours each day.  AR 844.  He indicated that Plaintiff "must use a cane" for standing/walking.  AR 844.  There was no physical activity on the questionnaire (other than "lift less than 10 lbs.") that he opined Plaintiff could do more often than "rarely."[7]  AR 844-45.

  b. Dr. Bilezikjian

Dr. Bilezikjian, an orthopedist like Dr. Schwarz, examined Plaintiff once in January 2013.  He observed that Plaintiff walked with a right-side limp and was unable to walk on tiptoes and heels.  AR 518.  He measured Plaintiff's left calf as 1 cm smaller than his right.  AR 517.  Plaintiff told Dr. Bilezikjian that he "uses a cane for support at all times."  AR 516.  He noted that Plaintiff was taking Vicodin and Trazodone for pain.  AR 517.  Dr. Bilezikjian conducted a positive straight-leg raising test with Plaintiff in the supine position.  Id.  He found minor motor deficits (i.e., "weakness" in the right toes, but "otherwise essentially normal strength"), some sensory deficits (i.e., diminished sensation in the ulnar aspect of the hands and right leg, but otherwise normal), and reflex deficits affecting both ankles.  AR 519.  He did not order any new imaging or diagnostic tests.

---

[7] With regard to this questionnaire, Dr. Lorber "disagree[d] with Dr. Schwarz's opinion" as "not supported by the evidence in the record."  AR 72-73.

18

He diagnosed Plaintiff with conditions including "lumbar disc disease with right-sided lumber radiculopathy." Id.  With regard to the cervical spine, he diagnosed "bilateral cervical radiculitis."[8]  AR 519.  He opined Plaintiff was limited to less-then-sedentary exertional work (i.e., walking/standing for only 2 hours each day using a cane, sitting for only 2 hours each day, and spending "most of the time in a reclining-type chair …or in bed").  With regard to Plaintiff's arms and shoulders, he opined that Plaintiff could push, pull, lift and carry 20 pounds occasionally and 10 pounds frequently, and Plaintiff could also perform "fine and gross manipulative movements" frequently.  Id.

    c.    Dr. Hasday

Dr. Hasday, an examining orthopedist, prepared four reports regarding Plaintiff, as follows:

• 5/19/09 Report (AR 591-607):  Plaintiff reported incidents when his pain would flare to 10 out of 10 for no apparent reason; to avoid flares, he was afraid to lift more than 1 or 2 pounds.  AR 592.  He reported "sometimes" using a cane.  Id.  Dr. Hasday noted that his "gait is normal," and Plaintiff could "walk on his heal and toes on the left without difficulty, but has pain with right heel and toe walking."  AR 596.

He diagnosed Plaintiff with (1) degenerative disc disease affecting C4-7 with "no objective cervical radiculopathy," (2) degenerative disc disease affecting the lumbar region with "non-specific right lumbar radiculitis," and (3) "severe spinal deconditioning syndrome due to prolonged bedrest …."  AR 604.  He determined that Plaintiff's symptoms had "substantially escalated" rather than improving.  He recommended pool therapy with the goal of

---

[8] According to Dr. Lorber, "radiculitis" is a "meaningless" word that some physicians use when they cannot find enough evidence to diagnose radiculopathy.  AR 69-70.

returning Plaintiff to a home-based exercise program.  With such treatment, he was hopeful that Plaintiff could obtain maximum medical improvement in 4 to 6 months.  AR 606.

• 9/21/09 Report (AR 543-84):  He noted Plaintiff was taking ibuprofen and Vicodin.  AR 548.  The motor examination of his upper extremities was "normal."  AR 549.  As for walking, he reported Plaintiff's "gait is normal" and Plaintiff could "walk on heels and toes without difficulty."  AR 551.  He, too, measured Plaintiff's left calf as 1 cm smaller than his right.  AR 552.  He reviewed Plaintiff's medical records and 2005 deposition concerning his injuries from an earlier car accident.  AR 554-579.

He diagnosed Plaintiff with conditions including (1) degenerative disc disease affecting C4-7 with "no objective cervical radiculopathy," (2) degenerative disc disease affecting the lumbar spine with "clinical evidence of a right L5-S1s sensory radiculopathy," and (3) "mild arthralgias" (i.e., joint pain) in his right knee.  AR 580.  He recommended lumbar epidural injections.  AR 583.

• 3/17/11 Report (AR 526-41):  As patient history, Dr. Hasday noted that Plaintiff attended pool therapy for three or four months in 2010, but stopped upon deciding it was "not really helping."  AR 527.  He had not received acupuncture, chiropractic treatment or injections to treat his back pain.  Id.  Some days he stayed in bed all day, but other days he was able to go grocery shopping.  Id.  He purchased his own cane for "prolonged, outdoor walking."  AR 528.  He could drive, but reported that his spinal pain "will affect his vision" while driving.  Id.  He sometimes used a heating pad on his lower back which "helps the pain," but does not resolve it.  AR 529.  Plaintiff denied prior non-industrial injuries with residual impairments, vehicle

accidents or sports-related injuries.  AR 530.[9]

From his own examination, Dr. Hasday noted that Plaintiff had some decreased sensation, again in the ulnar region of his hands, but that motor functioning was otherwise "normal" for his upper extremities.  AR 531.  He observed Plaintiff's gait to be "normal" and observed him perform "right heel to toe walking" with pain.  AR 532.  He found no issue with Plaintiff's reflexes and opined that the "motor examination is normal" for lower extremities.  AR 533.

Dr. Hasday diagnosed Plaintiff with conditions including (1) degenerative disc disease with "no objective cervical radiculopathy" but "non-specific right lumber radiculitis;" (2) "severe spinal deconditioning syndrome due to prolonged bedrest," and (3) "moderate opioid dependency."  AR 537.  Dr. Hasday restricted Plaintiff to "light work" with no "repetitive activities at or above shoulder level with either arm."  AR 539.  He opined that while Plaintiff might benefit from physical therapy and regular home exercises, he did "not anticipate the need for surgery on his back, shoulders or neck."  Id.  He found Plaintiff qualified for vocational rehabilitation benefits.  Id.

• 12/10/14 Report (AR 708-38):  He noted Plaintiff's self-reported, worsening pain.  Plaintiff "continued to use a cane and was not attending any

---

[9] In the same report, Dr. Hasday noted that Plaintiff (1) suffered a "low back" injury while employed by the Sacramento Attack Team as a football player in 1992 (AR 544), (2) was involved in two vehicle accidents in 2000 and 2002 resulting in neck and back injuries (AR 544), (3) injured his knee in 1995 breaking up a fight as a correctional officer (AR 544); (4) suffered an industrial accident to his left shoulder in 2002 (by sitting in an office chair that broke, causing him to fall to the floor and miss 10 months of work [AR 544]), (5)  suffered another workplace injury in 2007 (he was hit in the head by a "combative minor" while attempting to extinguish a fire, causing him to fall to the ground and injure his neck, left elbow and knee; he missed one year and ten months of work [AR 545]).  AR 539-40.

organized physical therapy during the last 'few years.'" AR 710.  He observed Plaintiff's gait was "antalgic to the right." AR 713.  The measure of Plaintiff's right and left calves this time was the same.  Id.  Plaintiff's "pain diagram" was "virtually unchanged" from 2011.  AR 716.  Dr. Hasday's diagnoses did not change significantly from the 2011 exam.  AR 734.  He again restricted Plaintiff to "light work" with no "repetitive activities at or above shoulder level with either arm."  AR 736.  He suggested physical therapy, chiropractic care, regular home exercises, and walking "as much as possible for weight control." Id.  He also suggested epidural steroid injections again.  Id.

### d.   Dr. Lorber

Dr. Lorber testified as a medical expert ("ME") at the hearing.  He reviewed Plaintiff's medical records.  His opinion of Plaintiff's residual functional capacity was consistent with that adopted by the ALJ.  AR 73-74. He opined there was no evidence in the medical records that Plaintiff's condition required him to use a cane.  AR 74.  He also testified, "I do not see any pathology which would prevent him from having a normal gait."  AR 76. When opining concerning Plaintiff's RFC, he did not take into account the side effects of Plaintiff's pain medications, because he considered the prescribed medications inappropriate.  AR 75.  He did not testify about any psychiatric issues, which were outside his expertise.  AR 77.

### 3.   Discussion.

#### a.   Dr. Schwarz.

The ALJ rejected Dr. Schwarz's 2015 functional assessment of Plaintiff as being incapable of even sedentary work (AR 842-46) because such a limited functional assessment was inconsistent with: (1) Dr. Schwarz's "mild clinical findings" and "other mild evidence of record;" (2) Dr. Schwarz's "general lack of prescribed treatment beyond medication and home exercises," and (3) Dr.

Hasday's 2011 and 2014 opinions (AR 526, 708) that Plaintiff was capable of some light work.  AR 24.  The ALJ also noted and accepted Dr. Lorber's opinion that Dr. Schwarz's "limitations were not supported by his own treatment record."  AR 24, referencing AR 72-73.

These are specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Schwarz's opinions.  The three objective medical tests in the record (i.e., the MRI of Plaintiff's spine and right hip from 2009 [AR 470], the 2010 electro-diagnostic testing [AR 461-62], and the 2013 spinal x-rays and CT scan [AR 636[10]]) show no abnormalities beyond "mild" or "moderate" narrowing of certain areas of the spine consistent with some degree of degenerative disc disease, but inconsistent with an injury purportedly caused by falling and inconsistent with total physical disability.  Despite treating Plaintiff from 2009 through 2015, Dr. Schwarz did not undertake any treatment more aggressive than several months of pool therapy and pain medication.  While Dr. Hasday suggested steroid injections for pain management (AR 583, 736), Dr. Schwarz's records do not reflect that he ever referred Plaintiff for such treatment.[11]  Dr. Schwarz intended to refer Plaintiff

---

[10] These tests were performed at the emergency room when Plaintiff was taken there after passing out at the courthouse.  AR 636.  They showed "no evidence" of fracture or dislocation.  AR 636.  The doctor who reviewed the images opined that Plaintiff's "disc space heights are well-maintained" and "no significant degenerative or erosive change is noted."  Id.  The concluding impression was "unremarkable CT of the lumbar spine."  Id.

[11] Plaintiff says that Dr. Schwarz recommended steroid injections.  JS 16, citing AR 351, 709.  AR 351 is a record from psychiatrist, Dr. Friedman, and AR 709 is a record from Dr. Hasday.  Dr. Hasday notes that on September 10, 2012, Dr. Schwarz recommended "lumbar epidural steroid injections."  AR 709.  Dr. Schwarz's report dated September 10, 2012, however, does not legibly mention injections.  AR 384.

for a surgical consultation in 2010 (AR 436, 439), but there is no follow-up discussion in his treatment reports.  Plaintiff argues that he was afraid of the risks of surgical intervention.  JS 25, citing AR 709 (Plaintiff told Dr. Hasday that he declined steroid injections because "he was told by Dr. Schwarz, 'The injections will narrow your spinal column.'").  This does not plausibly explain why Dr. Schwarz or Plaintiff failed to pursue injections or some surgical intervention, given that (1) the "status quo" left Plaintiff essentially bed bound, and (2) there is no mention of this risk in Dr. Schwarz's own treatment records.

The opinion of a treating physician may be rejected where an ALJ finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).  The ALJ did so sufficiently here.  See also Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010) (ALJ property relied on ME's testimony that the record did not support disability claim to reject treating doctor's opinion that claimant could not work).

b.    Dr. Bilezikjian

The ALJ noted that in January 2013, Bilezikjian assessed Plaintiff as capable of "less than a full range of even sedentary work."  AR 23, referencing AR 519.  The ALJ found this assessment inconsistent with (1) Dr. Bilezikjian's own clinical findings, (2) prior medical evidence, and (3) "subsequent 2013 spinal x-rays and CT scans (AR 636) showing no significant findings apart from some mild degenerative changes."  AR 23.  The ALJ also concluded that Dr. Bilezikjian's opinions concerning how long Plaintiff could walk, sit or stand appeared to reflect Plaintiff's subjective complaints rather than clinical evidence, and that Dr. Bilezikjian did not refer Plaintiff for any treatment

"commensurate with his findings, such as surgery, physical therapy, pain management, etc." AR 23. Finally, the ALJ noted that Dr. Bilezikjian's extreme assessment was inconsistent with the opinions of Dr. Hasday, who opined in 2011 and again in 2014 that Plaintiff was capable of light work. AR 23, referencing AR 539, 736.

Plaintiff argues that it was not Dr. Bilezikjian's role as a consultative examiner to refer Plaintiff for additional treatment. JS 10. Putting aside that one reason, the others supplied by the ALJ are all specific and legitimate reasons to reject Dr. Bilezikjian's opinions and are supported by substantial evidence.

As for Dr. Bilezikjian's own 2013 clinical findings, Plaintiff argues that he measured Plaintiff's left calf as 1 cm smaller than his right, which is consistent with atrophy from limited use. JS 4, citing AR 517. Dr. Hasday, however, measured Plaintiff's left calf as 1 cm smaller than his right in 2009 (AR 552), but the same size as his right calf in 2014, even though Plaintiff's symptoms had allegedly worsened over that time span (AR 713). This diminishes the import of Dr. Bilezikjian measurement as indicative of atrophy. The other "findings" by Dr. Bilezikjian that Plaintiff argues support his extreme opinion are references to Plaintiff's self-reported pain symptoms. JS 9-10. Dr. Bilezikjian's clinical observations were only minor motor deficits. AR 517-19. As for the prior medical evidence (i.e., the 2009 MRI and 2010 electro-diagnostic testing) and the 2013 x-rays, this Court has already discussed that those records showed only mild to moderate abnormalities inconsistent with Dr. Bilezikjian's opinion of total disability.

c.    Dr. Hasday

Dr. Hasday restricted Plaintiff from any and all "repetitive activities at or above shoulder level with either arm." AR 539, 736. While the ALJ found

that Plaintiff has "some degree of degenerate joint disease in his shoulders," she declined to incorporate this absolute restriction into Plaintiff's RFC, finding "no indication the claimant is wholly precluded from using his upper extremities or positioning his arms at the shoulder."  AR 23-24.  Instead, she determined Plaintiff could frequently, but not constantly, use both upper extremities, without specifying any elevation restrictions.  AR 21.

The ALJ's determination that Dr. Hasday's restriction on all "repetitive activities at or above shoulder level with either arm" is inconsistent with Dr. Hasday's own report and Plaintiff's other medical records are specific and legitimate reasons for rejecting his opinion supported by substantial evidence. In 2009 and 2011, Dr. Hasday opined that the motor functioning of Plaintiff's upper extremities was "normal."  AR 531, 549.  As for other doctors, in 2009 shortly after the fall that caused the onset of Plaintiff's alleged disability, Dr. Schwarz noted "no tenderness" of Plaintiff's right shoulder and observed that Plaintiff's motor strength was "5+/5 for shoulder abduction."  AR 496.  In 2013, Dr. Bilezikjian noted nothing abnormal about Plaintiff's shoulders and opined that Plaintiff could push, pull, lift and carry 20 pounds occasionally and 10 pounds frequently.  AR 519.

Alternatively, based on the testimony of the VE, the ALJ found that Plaintiff would be able to work as an office helper, mail clerk, or cashier.  AR 27.  The descriptions of the exertional requirements of these jobs in the Dictionary of Occupational Titles ("DOT") do not include a requirement to perform repetitive activities at or above shoulder level.  As a result, any error committed by the ALJ in failing to incorporate Dr. Hasday's restriction was harmless error.  See JS 16.

### d.    Dr. Lorber

The ALJ found Dr. Lorber's opinions "well supported by his medical

records review, the clinical and diagnostic findings, Dr. Hasday's assessment, [and] the mild degree of treatment [Plaintiff] has received …."  AR 24. Nevertheless, Plaintiff argues that the ALJ erred in relying on Dr. Lorber's opinions to formulate Plaintiff's RFC because Dr. Lorber failed to take into account Plaintiff's obesity.  JS 11.  Not so.  Dr. Lorber specifically testified that he considered Plaintiff's obesity when forming his opinions.  AR 73.

**C.**   **ISSUE THREE:  The ALJ did not err by finding that Plaintiff's depression was not a "severe" mental impairment.**

**1.**   **The ALJ's Duties at Step Two.**

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a medically determinable "severe" impairment or combination of impairments.  20 CFR § 404.1520.  To evaluate the severity of alleged mental impairments in adults, ALJs "must follow" a "special technique" described by the regulations.  20 CFR § 404.1520a.  To use that technique, ALJs "must first evaluate [the claimant's] symptoms, signs and laboratory findings to determine whether [the claimant has] a medically determinable impairment(s)."  Id., ¶ (b)(1).  Upon determining that the claimant has a medically determinable impairment, the ALJ must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) …."  Id., ¶ (b)(2).  Paragraph (c) provides that rating the degree of functional limitation "requires [ALJs] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation."  Id., ¶ (c)(1), emphasis added.  Per regulation, the ALJ "will consider all relevant and available clinical signs and laboratory findings …."  Id.; see also 20 CFR § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled.").

Based on all the evidence, the ALJ must rate the claimant's functional

limitations in four areas: (1) daily living, (2) social functioning, (3) concentration, persistence and pace, and (4) episodes of decompensation. Id., ¶ (c)(3).  The ratings must be either "none, mild, moderate, marked or extreme."  Id., ¶ (c)(4).  If a claimant receives a rating of "none" or "mild" in the first three areas and "none" in the fourth area, then his mental impairment will be considered "not severe."  Id., ¶ (d)(1).

Finally, the ALJ must "document application of the technique in the decision."  Id., ¶ (e).  The ALJ's written decision "must incorporate the pertinent findings and conclusions based on the technique."  Id., ¶ (e)(4); see also Garrison v. Colvin, 759 F.3d 995, 1012-1013 (9th Cir. 2014) ("Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs.")

### 2.   Summary of the ALJ's Findings.

The ALJ started her analysis by summarizing the records of Plaintiff's mental health treatment.  Despite claiming a disability onset date of March 2009, the ALJ correctly noted that Plaintiff has no record of treatment for any mental health issues from 2009 to 2012.  AR 19.

In June 2012, Dr. Nehamen, Ph.D., examined Plaintiff for his workers' compensation claim and diagnosed him with anxiety and depression.  AR 19, referencing AR 637-659 (re-evaluation dated 1/2/13 referencing earlier report dated 6/26/12).  Dr. Nehamen observed that Plaintiff, "was respectful, in terms of answering the questions that were posted to him and did so intelligently.  His focus of attention was adequate to complete all aspects of the examination, including psychological testing."  AR 639.  Dr. Nehamen also observed that Plaintiff "was able to formulate a series of thoughts and present them in such a way that they could be easily understood.  Also, he was able to respond to questions without unnecessary detail … or rambling."  AR 645.  Plaintiff displayed appropriate abstract reasoning and social judgment.  AR

646.

In July 2012, Plaintiff began a treating relationship with Dr. David Friedman, M.D., Ph.D.  AR 19, citing AR 349-357 (initial report).  Plaintiff was "cooperative, fully oriented, and showed no cognitive defects or signs of psychosis."  AR 19, referencing AR 355 (noting unimpaired judgment, memory, thought process and speech).  Plaintiff received weekly outpatient treatment from Dr. Friedman through November 2012, then again April-June of 2013.  AR 19, referencing Dr. Friedman's records at AR 338-48 and AR 740-841.  Plaintiff returned to Dr. Friedman in January 2014, then saw him every 2-3 months through January 2015.  Id.  The ALJ characterized the treatment records from this period as "reflecting little more than the claimant's subjective responses to the Beck Depression Index and Dr. Friedman's continued diagnosis of depression and pain ...."  AR 19.  The ALJ noted that Dr. Friedman did not cite any "specific functional limitations" caused by Plaintiff's depression.  Id., referencing AR 333-48.  Instead, he generally opined that Plaintiff was "temporarily totally disabled" for purposes of his workers' compensation claim.  AR 356.  On his standard progress report forms for 2012, Dr. Friedman checked that Plaintiff should "remain off-work for the next 60 days."  E.g., AR 337.

After summarizing the records from Drs. Nehamen and Friedman, the ALJ concluded that "the available evidence does not support the conclusion that [Plaintiff] cannot perform gainful activity due, in part, to psychiatric impairments."  AR 19.  She attributed to his depression only "slight" functional impairments in the areas of daily living, social functioning, and concentration/persistence/pace.  AR 20.  As a result, she determined that his depression was not "severe."  Id.

As reasons supporting this conclusion, the ALJ cited (1) Plaintiff's lack of mental health treatment of any kind between 2009 and 2012, (2) Plaintiff's

1  failure to display any significant deficits in cognitive functioning when

2  examined by Drs. Nehamen and Friedman, (3) Plaintiff's sporadic treatment

3  history even following 2012 with no referrals for more intensive therapy, and

4  (4) the failure of either doctor to identify any "specific functional limitations"

5  attributable to Plaintiff's depression.  AR 19-20.  Furthermore, agency

6  psychologist Phaedra Caruso-Radin examined Plaintiff's records in 2013 and

7  determined that his depression was not severe.  AR 97, 112.

8  **3.   Analysis.**

9  Plaintiff argues that the ALJ erred in assessing the medical evidence,

10  because the opinions of Drs. Nehamen and Friedman show that Plaintiff has

11  more than "slight" functional impairments caused by his depression, pointing

12  to a number of issues.

13  First, in 2012, Dr. Nehamen assigned Plaintiff a Global Assessment of

14  Functioning ("GAF") score of 50, while Dr. Friedman assigned him a GAF

15  score of 52.  JS 17, citing AR 657, AR 762.  GAF scores reflect a clinician's

16  "rough estimate of an individual's psychological, social, and occupational

17  functioning used to reflect the individual's need for treatment."  Vargas v.

18  Lambert, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998).  A GAF score between 41-

19  50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional

20  rituals, frequent shoplifting) OR any serious impairment in social,

21  occupational, or school functioning (e.g., no friends, unable to keep a job)."

22  See Diagnostic and Statistical Manual of Mental Disorders (4th. ed., rev. 1994)

23  at pp. 30-33.  A GAF score between 51-60 indicates "Moderate symptoms

24  (e.g., flat affect and circumstantial speech, occasional panic attacks) OR

25  moderate difficulty in social, occupational, or school functioning (e.g., few

26  friends, conflicts with peers or co-workers)."  Id.

27  The GAF scale, however, does not does not have "a direct correlation to

28  the severity requirements" in social security disability law.  Klyse v. Colvin,

30

556 F. App'x 615 (9th Cir. 2014) (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)).  Thus, a GAF score indicating "moderate" or "severe" symptoms does not equate to an opinion that the claimant's mental disabilities are "severe" for purposes of step two of the sequential evaluation process.  Craig v. Colvin, 2016 U.S. App. LEXIS 14619, at *2-5 (9th Cir. Aug. 9, 2016) (finding ALJ did not error in claimant's depression non-severe, despite GAF score of 55); Zerba v. Comm'r of SSA, 279 F. App'x 438 (9th Cir. 2008) (finding substantial evidence supported ALJ's determination that the applicant's depression was not severe, notwithstanding a GAF score of 45).

Indeed, a GAF score is not even a "medical opinion" that the ALJ must discuss.  See 20 C.F.R. § 416.927(a)(2); Pinegar v. Comm'r of Soc. Sec. Admin., 499 F. App'x 666, 667 (9th Cir. 2012) (finding no error when an ALJ did not consider a claimant's GAF score); Aldrich v. Colvin, 2014 U.S. Dist. LEXIS 164287, at *29 (E.D. Wash. Nov. 24, 2014) ("An ALJ has no obligation to credit or even consider GAF scores in the disability determination."); Brown v. Colvin, 2015 U.S. Dist. LEXIS 127208, at *7-8 (E.D. Cal. Sept. 21, 2015) (rejecting argument that ALJ erred by failing to consider GAF score).  The ALJ's determination that Plaintiff's depression is not severe, therefore, cannot be faulted due to the ALJ's purported failure to give appropriate weight to Plaintiff's GAF scores.

Second, Plaintiff argues that Dr. Nehamen found that Plaintiff suffers from more than slight functional impairment in the area of concentration, persistence, and pace, because Plaintiff had trouble counting backward from 100 by 3; he could do it, but "slowing and with difficulty."  AR 646.  It is the Plaintiff's burden at step two to provide medical evidence supporting a severity determination.  The ability to count backward from 100 by 3 only slowly does

not indicate more than a slight mental impairment.  <u>Back v. Colvin</u>, 2016 U.S. App. LEXIS 11934, at *5 (9th Cir. June 29, 2016) (upholding ALJ's conclusion that claimant had "psychological capacity sufficient to complete an average work week" despite "trouble counting backwards from 100 by 7s"); <u>Creggett v. Colvin</u>, 2015 U.S. Dist. LEXIS 33800, at *9, 19 (N.D. Cal. Mar. 18, 2015) (finding "moderate" difficulties in concentration, persistence and pace where claimant "was unable to count backward by sevens" at all and had low I.Q.); <u>Stoddard v. Astrue</u>, 2009 U.S. Dist. LEXIS 58233, at *21 (C.D. Cal. July 8, 2009) (upholding ALJ's determination that claimant's mental impairments were non-severe, despite claimant's loss of "concentration performing 'serial sevens' (counting backward from 100 in increments of seven")).

Third, Plaintiff points to Dr. Friedman's 2012 opinion finding him "temporarily totally disabled."  JS 17 citing AR 356.  Of course, Dr. Friedman followed that opinion with a note that he expected Plaintiff's temporary disability to last "another 6 to 9 months."  AR 356, AR 762.  A condition must persist for a continuous period of at least 12 months to qualify as "severe."  20 CFR § 404.1509.  The ALJ, therefore, did not err in failing to give controlling weight to Dr. Friedman's opinion of temporary disability.

Fourth, Plaintiff notes that on Dr. Friedman's standard progress report form, he sometimes checked a box indicating that Plaintiff had "impaired concentration."  JS 17, citing AR 743, 745-49, 752, 754.  Other times, however, he did not check that box.  <u>Cf.</u>, AR 743 and 744 (noting Plaintiff had "impaired concentration" on 10/8/12, but not on 10/11/12), AR 749 and 750, 753 (noting Plaintiff had "impaired concentration" on 8/13/12 and 9/27/12, but not on 9/13/12), AR 751 and 752 (noting Plaintiff had "impaired concentration" on 10/30/12, but not on 11/8/12).  The ALJ did not err in failing to interpret Dr. Friedman's sporadic box checking as an opinion that

Plaintiff's depression impaired his concentration more than slightly for a continuous period of 12 months.

Fifth, Plaintiff argues that Dr. Freidman observed Plaintiff display objective symptoms of depression, e.g., tearfulness, poor grooming, and somber affect (AR 355[12]), such that his diagnosis was not based entirely on Plaintiff's subjective complaints.  JS 17.  While this is true, the ALJ correctly noted that Dr. Freidman did not attempt to translate Plaintiff's objective symptoms into any opinions concerning Plaintiff's ability to perform workplace skills, let alone opinions that his depression-caused limitations more than slightly impaired his ability to work.

**D.**   **ISSUE FOUR:  The ALJ did not err in assessing Plaintiff's credibility.**

    **1.**   **Applicable Law.**

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036.  If so, the ALJ may not reject a claimant's testimony "simply because

---

[12] In contrast, Dr. Nehamen observed that Plaintiff "presented with good grooming."  AR 639.

1   there is no showing that the impairment can reasonably produce the <u>degree</u> of

2   symptom alleged."  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996).

3        Second, if the claimant meets the first test, the ALJ may discredit the

4   claimant's subjective symptom testimony only if he makes specific findings

5   that support the conclusion.  <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir.

6   2010).  Absent a finding or affirmative evidence of malingering, the ALJ must

7   provide "clear and convincing" reasons for rejecting the claimant's testimony.

8   <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995); <u>Ghanim v. Colvin</u>, 763 F.3d

9   1154, 1163 & n.9 (9th Cir. 2014).  The ALJ must consider a claimant's work

10  record, observations of medical providers and third parties with knowledge of

11  claimant's limitations, aggravating factors, functional restrictions caused by

12  symptoms, effects of medication, and the claimant's daily activities.  <u>Smolen</u>,

13  80 F.3d at 1283-84 & n.8.  "Although lack of medical evidence cannot form

14  the sole basis for discounting pain testimony, it is a factor that the ALJ can

15  consider in his credibility analysis."  <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th

16  Cir. 2005).

17       The ALJ may also use ordinary techniques of credibility evaluation,

18  such as considering the claimant's reputation for lying and inconsistencies in

19  his statements or between his statements and his conduct.  <u>Smolen</u>, 80 F.3d at

20  1284; <u>Thomas</u>, 278 F.3d at 958-59.[13]

---

21       [13] The Social Security Administration ("SSA") recently published SSR

22  16-3p, 2016 SSR LEXIS 4, Policy Interpretation Ruling Titles II and XVI:
    Evaluation of Symptoms in Disability Claims.  SSR 16-3p eliminates use of the

23  term "credibility" from SSA policy, as the SSA's regulations do not use this

24  term, and clarifies that subjective symptom evaluation is not an examination of

25  a claimant's character.  <u>Murphy v. Comm'r of Soc. Sec.</u>, 2016 U.S. Dist.
    LEXIS 65189, at *25-26 n.6 (E.D. Tenn. May 18, 2016).  SSR 16-3p took

26  effect on March 16, 2016, and therefore is not applicable to the ALJ's decision

27  in this case.  <u>Id.</u>

28

**2.    Plaintiff's Testimony.**

Plaintiff provided the following information about his condition, in chronological order:

2009:  Attached to Dr. Hasday's September 2009 report is a 2-page questionnaire that Plaintiff completed describing his daily activities following his March 2009 injury.  Plaintiff checked a box indicating that he can "walk only short distances," but he did not check the box indicating that he uses a cane.  AR 587.  He indicated he could only sit, stand or walk 15-30 minutes at a time.  Id.  He said he was unable to grasp objects with his hands or reach something overhead.  Id.  He could not kneel, bend or squat.  AR 588.  He could not grip, grasp, hold or manipulate objects with his hands.  AR 587.

2012:  Plaintiff completed an "exertion questionnaire" dated October 25, 2012.  AR 284-86.  He reported that he could stand for no more than 10 minutes or sit for no more than 15 minutes due to back pain.  AR 284.  He was "only able to lay in the bed on a daily basis."  AR 284.  He tried to move as little as possible.  Id.  He could lift "nothing," and was "very careful" even when lifting a cup of water to drink.  AR 285.  He could not climb stairs, grocery shop, drive, or do household chores.  AR 285-86.  When asked what assistive devices he was using, he checked the box for "brace," but not for "cane."  AR 286.  He reported being in so much pain at times that he would use a bedpan, because he could not get to the restroom.  AR 286.

2013:  At the first hearing on August 7, 2013, Plaintiff testified that his back hurt "every time" he would sit or stand; it felt like "the bone is rubbing."  AR 42.  Whenever he sits, his "legs go to sleep."  AR 44.  His head also aches "nonstop."  AR 42.  The pain medications make him dizzy.  AR 43.  He can only sit for 30-45 minutes until he must lay down to avoid sharp pain and spasms.  AR 44.  He spends most of each day lying down.  AR 45.  He can only stand 15 or 20 minutes before needing to lie down.  Id.  He cannot even

take "a good regular breath because it hurts."  AR 46.  He cannot pick up something from the ground.  Id.

Although he spends most of his time laying down and takes sleep medication, he hardly sleeps.  AR 47.  Sometimes he stays with his mother, sometimes he sleeps on a friend's couch, and sometimes he stays in his car.  Id. Plaintiff confirmed that his doctors had not done anything for him other than physical therapy and pain medication.  AR 43.  The physical therapy did not help.  AR 44.

2015:  At the second hearing on June 8, 2015, Plaintiff testified that he drives a car once every three or four months, and that has been true "since [he] got injured."  AR 63.  He also testified he has been using a cane since he was injured.  AR 64.  He lays on his back and watches TV on his mother's couch all day long.  AR 81-82.  Plaintiff reaffirmed that he had received no treatment for his pain other than physical therapy and medication.  AR 81.

**3.    Analysis.**

Following the two-step process outlined above, the ALJ found that Plaintiff's statements considering the intensity, persistence and limiting effects of his pain were "not wholly credible."  AR 22, 25.  In arriving at this conclusion, the ALJ first summarized Plaintiff's account of his own functional limitations.  AR 22.  After summarizing Plaintiff's extreme testimony, the ALJ gave three reasons for discounting it.  First, she found it inconsistent with the objective medical evidence.  AR 22-24.  Second, she found it inconsistent with Plaintiff's irregular and conservative treatment.  AR 23-24.  Finally, the ALJ commented on Plaintiff's use of a cane at both hearings, contrasting it with the medical evidence and Dr. Lorber's opinion that no clinical evidence indicated that Plaintiff needed to use a cane.  AR 23.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a. The objective evidence is inconsistent with Plaintiff's testimony regarding the severity and extent of his limitations.

The ALJ's determination that the objective evidence is inconsistent with Plaintiff's testimony regarding the severity and extent of his limitations is supported by substantial evidence. As noted above, the ALJ thoroughly discussed both Plaintiff's testimony and the medical evidence. The ALJ cited various examinations and accurately noted that while the MRIs, x-rays and other testing documented some mild or moderate abnormalities supporting a diagnosis of degenerative disc disease, they did not reveal any physical condition that would be expected to cause pain so severe as to render Plaintiff essentially bedridden. Even Dr. Friedman opined that Plaintiff's statements he was "not physically able to do anything" were extreme. AR 353.

The ALJ also cited the opinions of Dr. Hasday, who examined Plaintiff, and Dr. Lorber, who reviewed all of Plaintiff's medical records. Both opined that Plaintiff could perform a limited range of light work, opinions that are inconsistent with Plaintiff's testimony concerning the extreme degree of his functional limitations. AR 23-24.

### b. Plaintiff's conservative treatment is inconsistent with his alleged inability to perform all work activity.

An ALJ may consider evidence of conservative treatment in discounting testimony regarding the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007). "Infrequent, conservative treatment is not indicative of a disabling impairment." Jimenez v. Colvin, 2013 U.S. Dist. LEXIS 88614, at *14 (C.D. Cal. June 24, 2013) (upholding ALJ's determination that treating "consisting of Tramadol and over-the-counter Motrin" was conservative) (citing Tommasetti v. Astrue, 533 F.3d 1035, 1039-1040 (9th Cir. 2008)). In assessing the claimant's credibility, "unexplained, or inadequately explained,

1   failure to seek treatment … can cast doubt on the sincerity of the claimant's

2   pain testimony."  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

3       Here, the records show Plaintiff received pool therapy for several months

4   in 2010 and pain medication.  The ALJ did not err in characterizing this

5   treatment history for pain management as conservative.  Walter v. Astrue,

6   2011 U.S. Dist. LEXIS 38179, at *9 (C.D. Cal. Apr. 6, 2011) (finding that ALJ

7   permissibly discounted plaintiff's credibility based on conservative treatment,

8   which included Vicodin, physical therapy, and a single injection).

9       Plaintiff argues that he had "legitimate reasons to avoid more aggressive

10  treatment," i.e., his concern that injections might cause his spinal column to

11  narrow.  JS 25, 28.  As discussed above, Plaintiff's stated concern does not

12  appear to be a legitimate reason to have avoided injections or surgery, given

13  the lack of improvement he experienced over many years and his failure to

14  have a discussion about the risks with Dr. Schwarz documented in Dr.

15  Schwarz's own treatment records.

16          c.    **Plaintiff's testimony concerning his use of a cane has been**

17                **inconsistent over time and inconsistent with clinical**

18                **observations.**

19      The Court summarizes the following information in the record

20  concerning Plaintiff's use of a cane, in chronological order:

21      • 2009:  Plaintiff told Dr. Hasday that he "sometimes" uses a cane, but

22  Dr. Hasday found Plaintiff's "gait is normal."  AR 592.  On a daily activities

23  report, Plaintiff did not check the box indicating that he was using a cane.  AR

24  587.

25      • 2011:  Dr. Hasday reported that Plaintiff used a cane for "prolonged,

26  outdoor walking."  AR 528.  Dr. Hasday again found Plaintiff's gait was

27  "normal."  AR 532.

28      • 2012:  When Plaintiff completed an "exertion questionnaire and was

asked what assistive devices he was using, he checked the box for "brace," but he did not check the box for "cane."  AR 286.

• 2013:  Plaintiff told Dr. Bilezikjian that he "uses a cane for support at all times."  AR 516.  Dr. Schwarz noted that Plaintiff was using a cane and recommended that he continue to do so "as needed."  AR 686, 692-93, 703-04. However, on all of Dr. Schwarz's progress report forms, there are boxes that he could have checked to indicate that the patient was "using splint, crutches, cane, brace," or that the use of such devices was part of the "treatment plan." E.g., AR 420.  Dr. Schwarz did not check those boxes.

• 2015:  Plaintiff told the ALJ that he been using a cane since he was injured in March 2009.  AR 64.

The 2009 and 2011 findings that Plaintiff had a "normal" gait at those times are inconsistent with Plaintiff's hearing testimony that he has needed to use a cane since he fell in March 2009.  Thus, the ALJ did not err in citing Plaintiff's testimony concerning his use of a cane as a reason to discount his credibility.

## IV.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

Dated: September 12, 2016

_____
KAREN E. SCOTT
United States Magistrate Judge